# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-cr-121 (RJL)** |
| | ) | |
| | ) | **FILED** |
| **FOKKER SERVICES B.V.,** | ) | **FEB 0 5 2015** |
| | ) | |
| **Defendant.** | ) | Clerk, U.S. District & Bankruptcy |
| | | Courts for the District of Columbia |

## MEMORANDUM OPINION
(February _5_, 2015) [Dkt. #3]

On June 5, 2014, the United States ("the Government") filed an Information

charging Fokker Services B.V. ("Fokker Services") with one count of Conspiracy to

Unlawfully Export U.S.-Origin Goods and Services to Iran, Sudan, and Burma. *See*

Information ("Info.") [Dkt. #1]; *see* 18 U.S.C. § 371 (conspiracy to commit offense

against the United States); 50 U.S.C. § 1705 (International Emergency Economic Powers

Act). The conspiracy, which spanned a five-year period of time from 2005 to 2010,

included over 1100 separate illegal shipments of parts and components used in aircraft

aviation and navigation systems and other aircraft systems that were subject to export

control for national security and/or anti-terrorism reasons. Before the Court now is a

Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act ("STA Mot.")

[Dkt. #3]. Upon consideration of the parties' pleadings, argument, relevant law, and the

entire record therein, the motion is DENIED.

## BACKGROUND

Fokker Services is a Dutch aerospace services provider and subsidiary of Fokker Technologies Holding B.V., a Dutch manufacturing and technical services company. Info. ¶ 1. Fokker Services serves operators and owners of aircraft manufactured by Fokker Services' predecessor, Fokker Aircraft, B.V. Info. ¶ 3. It provides "logistical support, component maintenance, repair and overhaul, technical services, and aircraft maintenance and modification." *Id.* Fokker Services uses aircraft parts manufactured throughout the world, including in the United States. *Id.*

Fokker Services' United States activities are subject to United States laws and oversight by the Department of Treasury's Office of Foreign Assets Control ("OFAC"), which administers and enforces economic and trade sanctions against certain foreign countries, as well as the Department of Commerce's Bureau of Industry and Security ("BIS"). Info. ¶ 4. Among those regulations with which Fokker Services' U.S. activities must comply are the economic sanctions the Government has established with respect to Iran, Iranian Transaction Regulations, 31 C.F.R. Part 560[1]; Burma, Burmese Sanctions Regulations, 31 C.F.R. Part 537; and Sudan, Sudanese Sanctions Regulations, 31 C.F.R. Part 538.

The Iranian and Sudanese sanctions prohibit, among other things, the unlicensed exportation or re-exportation, directly or indirectly, of any goods, technology, or services from the United States or any U.S. person to Iran or Sudan. *Id.* §§ 538.205, 560.204.

---

[1] These are now called the Iranian Transactions and Sanctions Regulations after being renamed and reissued in 2012.

The Iranian sanctions also prohibit the re-exportation from a third country to Iran of any goods, technology, or services that had been exported from the United States. *Id.* § 560.205. The Burmese sanctions prohibit new investment in Burma and the exportation or re-exportation of financial services to Burma from the United States or any U.S. person. *Id.* § 537.202, 537.204. The sanctions against all three countries further prohibit transactions by U.S. people or within the United States to evade or avoid the sanctions' prohibitions. *Id.* §§ 537.206, 538.211, 560.203. Fokker Services historically has worked with eleven Iranian customers, including five Iranian military customers (*e.g.*, its Army, Navy, and Air Force), four Sudanese customers, and four Burmese customers. Info. ¶¶ 6-8.

The Information charges Fokker Services with violating U.S. export laws from 2005 until 2010 "by engaging in illegal transactions involving the export and re-export of aircraft parts, technology, and services to U.S.-sanctioned countries, specifically, Iran, Burma, and Sudan . . ., without first obtaining a license from OFAC." Info. ¶ 9. Specifically, Fokker Services is charged with "knowingly initiating, either directly or indirectly, 1,153 shipments of aircraft spare, repaired, or exchanged parts, or a combination thereof" with a U.S. nexus[2] to customers the company knew to be located in sanctioned countries. Info. ¶ 10.

---

[2] The Information defines "U.S. nexus" as one of two possibilities: "(1) [Fokker Services] sent shipments to U.S. repair shops for repair knowing that the shipments consisted of parts and technology derived from aircraft controlled by [Fokker Services'] customers located in U.S.-sanctioned countries; or (2) the shipments contained U.S.-origin parts or technology that were subject to export license requirements under U.S. law at the time of shipment." Info. ¶ 10.

The Information charges a scheme of deliberate conduct to evade the sanctions and detection by U.S. companies and authorities. According to the Information, Fokker Services withheld or falsified tail numbers, or falsely indicated parts were to be used as "stock parts" when reporting to U.S. or U.K. companies so as to conceal its customers' affiliations with U.S.-sanctioned countries. Info. ¶ 21a. It tracked U.S. companies' attention to export controls and directed business to those companies that were not vigilant regarding compliance. Info. ¶ 21b. The company deleted references to Iran in materials sent to U.S. subsidiaries and repair shops, Info. ¶ 21c, and removed fields relating to ultimate end-user information from an internal parts-tracking database, Info. ¶ 21d. In addition, Fokker Services directed employees to hide activities and documents related to Iranian transactions from U.S. Federal Aviation Administration inspectors. Info. ¶ 21e. Although Fokker Services did briefly suspend operations with Iran in 2008, it quickly resumed business with Iranian commercial customers. Info. ¶ 22d-e. This business with Iran continued in spite of advice to senior management from an export compliance manager and in-house counsel in 2009 that no U.S.-origin parts could be shipped to Iran. Info. ¶ 22f. The Information seeks forfeiture of $21 million. Info. at 11.

On the same day that it filed the Information, the Government filed a Deferred Prosecution Agreement ("DPA") and attendant Factual Statement ("FS"), STA Mot., Ex. A [Dkt. #3-1], along with its Motion to Exclude Time Under the Speedy Trial Act, STA Mot. The Factual Statement sheds additional light on the circumstances surrounding and following the alleged actions here. The majority of illegal conduct at issue involved

Iranian customers. FS at 1 n.1. Gross revenue from shipments in violation of U.S. export laws totaled approximately $21 million. FS ¶ 4.

The Factual Statement makes clear that certain policies and practices were carried out with the knowledge and approval of senior management. FS ¶ 2. As early as 2002, Fokker Services was aware of U.S. export laws regarding Iran, because it applied for a license from OFAC to re-export U.S.-originated traffic control systems to Iran; the license was denied in 2004. FS ¶¶ 19, 21.

In 2007, management organized a working group to evaluate export compliance policies, particularly regarding Iran. FS ¶ 23. The working group explicitly recognized the prohibitions put into place by American sanctions. *Id.* In 2008, Dutch customs authorities detained two packages of parts and warned Fokker Services it could not defend the company if it encountered problems with United States authorities regarding export compliance. FS ¶¶ 25-27. Despite this knowledge and warning, Fokker Services continued to do business with its Iranian civilian customers, though ceased business with Iranian military customers. FS ¶¶ 27-28. With respect to U.S. sanctions in particular, Fokker Services decided it would comply with U.S. export laws "only to the extent it was bound by the terms of any end-user statements [it] had signed with U.S. companies." FS ¶ 28. Members of the management team, including the president of the company, were aware of this decision. FS ¶ 29.

In 2010, however, the company changed course. On June 23 of that year, Fokker Services provided BIS and OFAC an initial notice of disclosure of transactions implicating U.S. regulations, which it has supplemented with additional submissions. FS

¶¶ 36, 38. The company hired an outside law firm to conduct an internal investigation and has cooperated with U.S. law enforcement and regulatory authorities. FS ¶¶ 36, 39.

According to the Factual Statement, Fokker Services has undertaken some voluntary steps to enhance its compliance programs, which now is subject to regular audits. FS ¶ 40, 40ix. It stopped all new business with U.S.-sanctioned countries and fulfilled its pre-existing contractual obligations only to the extent transactions complied with U.S. law. FS ¶ 40i. After investigating the conduct of its employees, Fokker Services fired its president, demoted or reassigned the duties of certain personnel, and trained employees in U.S. export controls and economic sanctions. FS ¶ 40ii. In the meantime, it has adopted a new compliance program with officers who report to the highest levels of management, including one officer who reports to Fokker Services' parent company, and has revised its written compliance materials. FS ¶ 40iii-iv. The company's electronic systems now allow employees to determine if a part previously has been used in an embargoed country. FS ¶ 40v. Employees can report potential violations anonymously and are trained in compliance. FS ¶ 40viii, x. The company incorporated language into its contracts indicating it will not export or re-export in violation of U.S. or certain other laws and requires all customers to sign end-user agreements. FS ¶ 40 vi-vii. Finally, Fokker services terminated its relationship with sanctioned banks and closed its Iranian office presence. FS ¶ 40xi.

The United States government and Fokker Services have entered into an agreement whereby Fokker Services accepts and acknowledges responsibility for its conduct in violation of U.S. export laws, and the United States agrees to dismiss with

prejudice the charges against Fokker Services if the company complies with all terms of the agreement for a period of eighteen months. DPA ¶¶ 2, 4. Pursuant to the DPA, Fokker Services agrees to pay the United States $10.5 million dollars, DPA ¶ 3, continue to cooperate with United States authorities and agencies regarding the conduct at issue, DPA ¶¶ 5, 6, implement its new compliance program and policies, DPA ¶ 5vi-vii, and, of course, comply with U.S. export laws, DPA ¶ 5ix. Upon successful completion of the eighteen-month agreement term, the United States agrees it will not prosecute Fokker Services or other members of its corporate family for acts within the scope of or related to the investigation and Factual Statement, unless relating to a transaction Fokker Services failed to disclose. DPA ¶ 7.

## ANALYSIS

The DPA was filed before this Court in conjunction with a motion to exclude time under the Speedy Trial Act, 18 U.S.C. § 3161. STA Mot.; STA Mot., Ex. A. The Speedy Trial Act calls for a trial to begin within 70 days of the filing of an information or indictment. 18 U.S.C. § 3161(c)(1). However, when calculating the time in which a trial on a charged offense must commence, the Act excludes certain periods of delay. *Id.* § 3161(h). Relevant here, the statute excludes "[a]ny period of delay during which prosecution is deferred by the attorney for the Government pursuant to written agreement with the defendant, with the approval of the court, for the purpose of allowing the defendant to demonstrate his good conduct." *Id.* § 3161(h)(2). The plain language of the statute calls for court approval, and it is this approval the parties now seek. *See United States v. HSBC Bank USA, N.A.*, No. 12-CR-763, 2013 WL 3306161, at *3 (E.D.N.Y.

July 1, 2013) ("[U]nder a plain reading of this provision, a court is to exclude the delay occasioned by a deferred prosecution agreement, but only upon approval of the agreement by the court.").

Both of the parties argue, not surprisingly, that the Court's role is extremely limited in these circumstances. Govt.'s Supplemental Mem. in Supp. of Deferred Prosecution Agreement Reached with Fokker Services B.V. at 10-15 ("Govt.'s 7/18 Mem.") [Dkt. #11]; Fokker Servs. B.V.'s Mem. in Supp. of the Deferred Prosecution Agreement with the Govt. at 2-4 ("Fokker Servs.' 7/18 Mem.") [Dkt. #12]. They essentially request the Court to serve as a rubber stamp unless there is an indication that (a) the defendant did not enter into the agreement willingly and knowingly, Govt.'s 7/18 Mem. at 10, or (b) the agreement was designed solely to circumvent Speedy Trial Act limits, Govt.'s 7/18 Mem. at 12; Fokker Servs.' 7/18 Mem. at 2-3. Unfortunately for the parties, the Court's role is not quite so restricted.

My fellow District Judge in the Eastern District of New York, Judge John Gleeson, addressed this very issue last year, and I agree with his well-reasoned conclusion that a District Court has the authority "to approve or reject the DPA pursuant to its supervisory power." *HSBC*, 2013 WL 3306161, at *4; *see also United States v. WakeMed*, No. 5:12-CR-398-BO, 2013 WL 501784 (E.D.N.C. Feb. 8, 2013) (approving a DPA after holding two hearings, considering the wrongful conduct and agreed upon terms, and "weighing the seriousness of defendant's offense against the potential harm to innocent parties that could result should this prosecution go forward"). Indeed, it is that "supervisory power . . . [that] permits federal courts to supervise the administration of

8

criminal justice among the parties before the bar." *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (internal quotation marks omitted); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) (Scalia, J., concurring) ("[E]very United States court has an inherent supervisory authority over the proceedings conducted before it . . . .").

One of the purposes of the Court's supervisory powers, of course, is to protect the integrity of the judicial process. *See Payner*, 447 U.S. at 735 n.8; *see also HSBC*, 2013 WL 3306161, at *6 ("The inherent supervisory power serves to ensure that the courts do not lend a judicial imprimatur to any aspect of a criminal proceeding that smacks of lawlessness or impropriety."). Indeed, Justice Louis Brandeis himself addressed the responsibility of the court to uphold the integrity of the judicial process by denying legal redress in appropriate situations in order to maintain respect for law and private confidence in the administration of justice. *See Olmstead v. United States*, 277 U.S. 438, 483-85 (1928) (Brandeis, J., dissenting).

The Government, of course, has the clear authority *not* to prosecute a case. *See I.C.C. v. Bhd. of Locomotive Engineers*, 482 U.S. 270, 283 (1987). Indeed, this Court would have no role here if the Government had chosen not to charge Fokker Services with any criminal conduct—even if such a decision was the result of a non-prosecution agreement. But the Government *has* charged Fokker Services with criminal activity. And it does not propose to dismiss the case at this point; rather, under the proposed resolution, this criminal case would remain on this Court's docket for the duration of the agreement's term. DPA ¶ 4.

The parties are, in essence, requesting the Court to lend its judicial imprimatur to their DPA.  In effect, the Court itself would "become [an] instrument[] of law enforcement." *McNabb v. United States*, 318 U.S. 332, 347 (1943).  The parties also seek to retain the possibility of using the full range of the Court's powers in the future should Fokker Services fail to comply with the agreed upon terms.  To put it bluntly, the Court is thus being asked to serve as the leverage over the head of the company.

When, as here, the mechanism chosen by the parties to resolve charged criminal activity requires Court approval, it is this Court's duty to consider carefully whether that approval should be given.  "By placing a criminal matter on the docket of a federal court, the parties have subjected their DPA to the legitimate exercise of that court's authority." *HSBC*, 2013 WL 3306161, at *5.

I do not undertake this review lightly.  I am well aware, and agree completely, that our supervisory powers are to be exercised "sparingly," *United States v. Jones*, 433 F.2d 1176, 1181-82 (D.C. Cir. 1970) (internal quotation marks omitted), and I fully recognize that this is not a typical case for the use of such powers.  The defendant has signed onto the DPA and is not seeking redress for any impropriety it has identified. *See United States v. Johnson*, 221 F.3d 83, 96 (2d Cir. 2000) (describing the contexts in which supervisory powers generally are exercised).  But the Court must consider the public as well as the defendant.  After all, the integrity of judicial proceedings would be compromised by giving the Court's stamp of approval to either overly-lenient prosecutorial action, or overly-zealous prosecutorial conduct.

Here, Fokker Services is charged with a five-year conspiracy to violate and evade United States export laws for the benefit, largely, of Iran and its military during the post-9/11 world when we were engaged in a two-front War against terror in the Middle East. These voluminous violations during that period were knowing and willful, and were orchestrated at the highest levels of the company. The company brought in $21 million in revenue from these illegal transactions of parts that were being excluded from sale to these particular countries for national security and anti-terrorism reasons. Indeed, the majority of Fokker Services' illegal conduct involved sales of aviation and avionic parts to Iran.

Notwithstanding this egregious conduct over a sustained period of time, the Government has agreed to dismiss the Information if Fokker Services pays a fine of $10.5 million, cooperates with the Government, implements its compliance program, and complies with U.S. export laws for only eighteen months. As such, even when combined with penalties it must pay to other U.S. regulatory agencies as part of a global settlement on these issues,[3] the Government is not requiring Fokker Services to pay as its fine a penny more than the $21 million in revenue it collected from its illegal transactions. Govt.'s 7/7 Mem. at 15-16.

If that is not surprising enough, under the DPA no individuals are being prosecuted for their conduct at issue here, Govt.'s 7/7 Mem. at 18-20, and a number of the employees who were directly involved in the transactions are being allowed to remain

---

[3] Fokker Services is required to pay an additional $10.5 million to resolve BIS and OFAC's investigations. Govt.'s Mem. in Supp. of Deferred Prosecution Agreement Reached with Fokker Servs. B.V. at 15 ("Govt.'s 7/7 Mem.") [Dkt. #8].

with the company, FS ¶ 40ii.  Although Fokker Services did ultimately hire a new

president, the other employees who engaged in this conduct simply "received training . . .

[and] were removed from decision-making positions or demoted, or had some of their

duties reassigned." *Id.*; *see also* Govt.'s 7/7 Mem. at 12.  Finally, the DPA does not call

for an independent monitor, or for any periodic reports to be made to either this Court or

the Government verifying the company's compliance with U.S. law over this very brief

18-month period.  *See* Govt.'s 7/7 Mem. at 13-14.  As such, the Court is being left to rely

solely on the self-reporting of Fokker Services.  One can only imagine how a company

with such a long track record of deceit and illegal behavior ever convinced the

Department of Justice to agree to that!

The parties, not surprisingly, argue that Fokker Services' voluntary self-disclosure

of the conduct at issue, cooperation and remediation efforts, and precarious financial

condition support the Government's position that the current DPA appropriately punishes

Fokker Services while allowing for company rehabilitation.  Govt.'s 7/7 Mem. at 5-6, 10-

17, Govt.'s 7/18 Mem. at 5-10, 15-17; Fokker Servs.' 7/18 Mem. at 8-10.  I disagree.

While I do not discount Fokker Services' cooperation and voluntary disclosure[4] or,

for that matter, its precarious financial situation,[5] after looking at the DPA in its totality, I

cannot help but conclude that the DPA presented here is grossly disproportionate to the

gravity of Fokker Services' conduct in a post-9/11 world.  In my judgment, it would

---

[4] In light of the Government's September 30, 2014 Status Report, I am satisfied with the Government's conclusion that Fokker Services' disclosure was voluntary. *See* Govt.'s Status Report [Dkt. #20].
[5] The Government has represented that Fokker Services requires financial support from its parent company, Fokker Technologies Holding B.V., in order to meet the costs of complying with this agreement and others Fokker Services has reached with other U.S. agencies.  Govt.'s 7/18 Mem. at 17 n.5.

12

undermine the public's confidence in the administration of justice and promote disrespect for the law for it to see a defendant prosecuted so anemically for engaging in such egregious conduct for such a sustained period of time and for the benefit of one of our country's worst enemies. Surely one would expect, at a minimum, a fine that exceeded the amount of revenue generated, a probationary period longer than 18 months, and a monitor trusted by the Court to verify for it and the Government both that this rogue company truly is on the path to complete compliance. As such, the Court concludes that this agreement does not constitute an appropriate exercise of prosecutorial discretion and I cannot approve it in its current form. To be clear, however, I am not ordering or advising the Government, or the defendant, to undertake or refrain from undertaking any particular action—I am merely declining to approve the document before me. I remain open to considering a modified version in the future should the parties agree to different terms and present such an agreement for my approval.

## CONCLUSION

Thus, for all the foregoing reasons, the parties' Joint Consent Motion for Exclusion of Time Under the Speedy Trial Act [Dkt. #3] is hereby DENIED. An appropriate order shall accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge